IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MENARD, INC.,

     Plaintiff & Counter-defendant,

     v.

DALLAS AIRMOTIVE, INC.,

     Defendant & Counter-claimant,

and

TEXTRON AVIATION, INC.,

     Defendant.

OPINION AND ORDER

18-cv-844-wmc

In this civil action, plaintiff Menard, Inc., ("Menards") asserts negligence claims against defendants Dallas Airmotive, Inc. ("DAI") and Textron Aviation, Inc., as well as a breach of contract claim against Textron, arising out of their engine overhaul work on two of Menards' airplanes.  In turn, defendant DAI filed counterclaims for tortious interference with contract and defamation based on Menards' sending 119 letters to other businesses or individuals with planes with the same engines as those in this case.  Before the court are cross-motions for summary judgment on DAI's counterclaims.  (Dkt. ##99, 104.)  For the reasons that follow, the court will grant DAI's motion in part, finding as a matter of law that the common interest privilege does not apply to Menards' correspondence.  As for Menards' motion and the remainder of DAI's motion, the court will deny both, finding that there are genuine issues of material fact as to whether the content of the letter was substantially true and whether the judicial immunity privilege applies.

In addition to the pending motions for partial summary judgment, defendant DAI also seeks judgment in its favor as a sanction for Menards' failure to produce documents timely following this court's order granting DAI's motion to compel.  (Dkt. #111.)  The court will also grant in part and deny in part the motion, declining to sanction Menards with a default judgment at this juncture, but finding that Menards' delay in complying with the court's order was neither justified nor entirely harmless.  As sanctions, therefore, the court will (1) award DAI its attorney's fees and costs in bringing this motion, (2) offer DAI an opportunity to renew its motion to compel the deposition of John Menard, and (3) warn Menards that further dilatory tactics could result in additional sanctions, up to and including a finding of default as to liability on DAI's counterclaims.

UNDISPUTED FACTS

At the outset, the court notes that the parties, in particular DAI, propose a number of proposed facts that are not material to the issues raised in the parties' cross-motions on DAI's counterclaims, or if material, only tangentially so.  Instead, those facts relate principally to Menards' negligence claim, which is *not* before the court at this time.  To be fair, *some* of these facts may be relevant to DAI's motion, but given the steep hurdle DAI faces on prevailing on a motion for summary judgment on claims for which it bears the burden of proof at trial, there is little purpose to recounting all of these facts in detail up front.  Instead, the court will generally note those factual categories omitted.  Accordingly, unless specifically noted, the court finds the following facts both material and undisputed.[1]

---

[1] For future reference, the court also notes that both parties fail to submit evidence in an admissible form' instead, they simply attach original documents to proposed findings of facts themselves.

### A. The Parties

Menards is a Wisconsin corporation with its principal place of business in Eau Claire, Wisconsin. Menards owns a fleet of aircraft used to transport employees to and from production facilities, distribution centers, retail stores and its corporate headquarters.

Dallas Automotive, Inc. ("DAI") is a Texas corporation, with its principal place of business in Dallas, Texas. For 60 years, DAI has been licensed by the Federal Aviation Administration ("FAA") to perform maintenance, repair, and overhaul ("MRO") services on certain types of aircraft engines.[2] DAI is also authorized by various original equipment manufacturers to service certain model engines designed and/or manufactured by those OEMs, including authorization by Pratt & Whitney Canada Corporation.[3]

While not a party to DAI's counterclaims, for context, defendant Textron Aviation, Inc., is a Kansas corporation with its principal place of business in Wichita, Kansas. Textron sold Menards the two planes at issue and also entered into contracts with Menards

Typically, unless the document is self-authenticating, an affidavit or declaration or a stipulation of the parties is required by the court's procedures on summary judgment. (*See* Preliminary Pretrial Packet in cases assigned to District Judge William M. Conley, available via hyperlink at dkt. #18.) Nonetheless, the court has considered these documents, assuming each party could authenticate and lay a proper foundation at trial, unless the proposed fact is expressly disputed on this basis.

[2] In response to several of DAI's proposed findings, Menards states that it does not dispute the finding for purposes of summary judgment, but points out that discovery is ongoing and that depositions of DAI witnesses and experts have been postponed. Regardless of whether Menards could have and failed to notice these depositions before the pandemic, these facts *are* undisputed for purposes of summary judgment. If Menards needed additional time to respond to DAI's motion -- an unlikely scenario given that Menards itself moved for summary judgment -- then it should have sought relief under Federal Rule of Civil Procedure 56(d).

[3] DAI offers several, additional proposed findings based on its reputation in providing exceptional MRO services and its investment in resources to maintain that reputation. (DAI's PFOFs (dkt. #110) ¶¶ 17-22.) While these facts may be relevant at trial, they are not material to the parties' bases for seeking summary judgment.

to complete the engine overhaul work in 2011 and 2013, but delegated the actual engine overhaul work to DAI.  (Compl. (dkt. #1-1) ¶¶ 2, 6.)[4]

## B.  2003 and 2006 Cessnas

In 2003, Menards purchased a 2003 Cessna 550 Citation Bravo from co-defendant Textron Aviation.  In 2006, Menards purchased a 2006 Cessna 550 Citation Bravo, again from Textron.  Both the 2003 and 2006 Cessnas are equipped with PW530A engines, which were originally manufactured by Pratt & Whitney Canada Corporation, a former defendant, with whom Menards has settled.  Pratt & Whitney and the FAA require PW530A engines to be overhauled every 4,000 flight hours.

Among the engines that DAI has been authorized to provide MRO services by Pratt & Whitney is the PW530A model engine.  In fact, DAI is the *only* entity in the United States -- other than Pratt & Whitney itself -- authorized by Pratt & Whitney to do MRO service on that engine.  Pratt & Whitney publishes a series of manuals, including updates, that provide requirements for MRO work on the PW530A engine, and under the contract between DAI and Pratt & Whitney, DAI is required to follow the instructions in the manuals.[5]

---

[4] Defendants removed the case to this court on diversity grounds.  (Dkt. #1.)  The court is satisfied that it has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a).  There is complete diversity between plaintiff and the defendants and the amount in controversy exceeds $75,000.  (*Id.* ¶¶ 14-19.)

[5] DAI submits a number of facts about the requirements in the manuals concerning inspection and replacement of diffuser bolts, as well as how those requirements changed over time (DAI's PFOFs (dkt. #110) ¶¶ 35-37, 41-47), but these facts are not material to the parties' reasons for seeking summary judgment on DAI's counterclaims, and, therefore, the court has not included them in its description of the undisputed facts.

As mentioned above, Textron hired DAI to perform the overhauls of four PW530A engines owned by Menard.  DAI completed the overhaul work on Menards' 2006 Cessna on June 27, 2011, and it completed the overhaul work on the 2003 Cessna on August 24, 2013.

On April 23, 2018, Menards entered into a Conditional Aircraft Sales and Purchase Agreement to sell the 2003 and 2006 Cessnas.  However, the sale of the planes was conditioned on a satisfactory pre-sale inspection, and that inspection revealed broken diffuser bolts on the 2003 Cessna's PW530A two engines, and on one of the two PW530A engines in the 2006 Cessna.  The parties dispute why the bolts were broken, and whether DAI's MRO work caused these defects.

Regardless of the defects' cause, Menards represents that the pre-purchase inspection resulted in a finding that the three engines were not in satisfactory condition, and neither aircraft was deemed airworthy due to the broken diffuser bolts.  (*See also* Menards' PFOFs (dkt. #101) ¶ 25 (citing Menards' PFOFs, Ex. D (dkt. #101-4) 6 (DAI evaluation dated May 4, 2018, concluding that the engines were "NOT APPROVED FOR RETURN TO SERVCES").)[6]  DAI does not dispute that the aircraft were not "airworthy," but directs the court to a letter purportedly from Vincent St-Pierre, Associate Director, Customer Engineering for Pratt & Whitney, stating that "[t]he discrepancy in the PW530A engines reported in the reference letter is under review at P&WC.  Based on our

---

[6] Menards also points to its expert's opinions on the reason for the bolt defect, but these opinions are also too far afield from the issues raised in the parties' cross-motions for summary judgment to justify summarizing here.

assessment, we do not believe field action is required at this time." (DAI's Resp. to Menards' PFOFs, Ex. 4 (dkt. #115-4).) Again, regardless of its accuracy, Menards filed "Service Difficulty Reports" with the FAA on August 1, 2018, for both planes' engines due to the broken diffuser bolts, and the original sale of the aircraft fell through. Although the planes later sold for a reduced price, the parties dispute the reason for the reduction.

### C. Menards' May 2019 Letters to PW530A Engine Owners

On September 14, 2018, Menards filed a complaint against DAI, Textron and Pratt & Whitney, asserting negligence claims against all three defendants and a breach of contract claim against Textron. With respect to DAI specifically, Menards alleges that it did not "adequately educate and inform itself as to the appropriate manner of inspecting diffuser bolts so that the end product was diffuser bolts which would perform without failure until the next scheduled engine overhaul." (Compl. (dkt. #1-1) ¶ 33.)

On December 27, 2019, DAI filed counterclaims against Menards for tortious interference with contractual relationships and defamation. These counterclaims arose out of Menards' May 29, 2019, correspondence to other PW530A engine owners, and subsequent communications with some of those owners. In the May 29 letter, Menards' Corporate Counsel Michael Q. Tidey wrote the following:

> I am in-house counsel for Menard, Inc. We own two Cessna Citation Bravo Aircraft with Pratt & Whitney 530A engines. I understand your organization owns Pratt & Whitney 530A engines, also.
>
> I am writing to inform you of a potential safety risk that we discovered with these engines. An engine borescope inspection revealed that diffuser bolts in three out of our four Pratt & Whitney 530A engines have failed. As a result, Menard, Inc.

6

> filed a Service Difficulty Report with the FAA and the engines were taken out of service.  These engines are not safe to fly in their current condition.
>
> Dallas Airmotive, Inc. performed engine overhaul work on the engines.  As part of its overhaul work, Dallas Airmotive removed and inserted the engine diffuser bolts.  Dallas Airmotive did not perform the overhaul work on all four engines at the same time.  Instead, there was a <u>two year time gap</u> between overhauls.  This time gap leads us to believe that there may be other engines that are currently operating with broken diffuser bolts.
>
> Safety is a top priority for us, as I am sure that it is a top priority in your organization as well.  If you have concerns or issues regarding your engines, I invite you [to] contact me directly.

(DAI's Counterclaims, Ex. 3 (dkt. #73-3).)  This letter was sent with the knowledge and approval of Michael O'Brien, chief of legal at Menards and Tidey's supervisor, and with the advanced knowledge of Menards' owner, John Menard.

The parties dispute Menards' reason or reasons for sending the letter.  Tidey avers in his declaration that the purpose of the letter was twofold: (1) to "obtain input from other engine owners as to related issues or concerns with their PW530A engines"; and (2) to "provide notice of what Menards considered and continues to consider a potential safety risk."  (Menards' PFOFs (dkt. #101) ¶¶ 51-52 (citing Tidey 11/15/19 Aff. (dkt. #66) ¶ 3).)  DAI disputes this, asserting instead that the letters were "sent with the singular purpose of causing harm to DAI by interfering with business relations with its customers

and prospective customers and damaging DAI's reputation."[7]

As for the letter's message, Tidey testified at his deposition in relevant part as follows:

> Q. And in your view, you're trying to tell us a reasonable person reading this you didn't think would come to the conclusion that Dallas Airmotive did something wrong when you mention . . . that the bolts were broken?
>
> A. I think a reasonable person could conclude a number of different thing of -- based on that sentence of what was the cause of the broken diffuser bolts.
>
> Q. Sure. One of those . . . a reasonable person would conclude would be it was Dallas Airmotive's fault, correct?
>
> A. Sure.

(Tidey Dep. (dkt. #103) 46-47.)

## D. The Aftermath of Menards' May 2019 Letters

DAI  learned of Menards' May 2019 letters from a third-party recipient.  On June 10, 2019, DAI sent Menards a letter, demanding:  (1) a list of all people to whom Menards send the letter; and (2) that Menards issue a retraction and an apology.  Menards refused both demands.  On June 19, 2019, Pratt & Whitney also issued a letter to at least some of its customers, in which it stated that it was "unaware of any basis" for Menards' statement

---

[7] DAI cites a number of facts in support of this assertion, which are no doubt relevant to DAI's response to Menards' attempt to invoke privileges, but the court need not reach at summary judgment for reasons discussed below.  (DAI's Resp. to Menards' PFOFs (dkt. #115) ¶ 51.)  DAI also submits a number of facts about Menards' attempts to settle its claim against DAI in the months leading up to the May 2019 letter.  (DAI's PFOFs (dkt. #110) ¶¶ 58-63.)  These facts are only marginally, if at all, relevant to DAI's counterclaims, but disputed as to Menards' motive in sending out the letter.

that "there is a 'potential safety risk.'"  (Menards' Resp. to DAI's PFOFs (dkt. #115) ¶ 91) (citing *id.*, Ex. 4 (dkt. #115-4)).)

Menards ultimately received follow-up contact from seventeen recipients of its May 2019 letters.  One of the engine owners informed Menards that after receiving its letter, it completed a borescope inspection and found what it believed to be a broken diffuser bolt in the "hot" area of the engine.  (Menards' PFOFs (dkt. #101) ¶ 56.)  In at least two responses, recipients described their impression that Menards was suggesting in its letter that DAI had caused the diffuser bolts to break.  (DAI's PFOFs (dkt. #110) ¶ 104 (citing Mariani Decl., Ex. 21 (dkt. #109-21) 6; *id.*, Ex. 28 (dkt. #109-28).)

DAI also proposed facts about a lost business deal with a prospective MRO service customer, GRP, Inc.  DAI's evidence that the contract was lost *because* of the Menards' letter, however, is based on double hearsay, and without more, the court declines to adopt these proposed findings.  The Vice President of Sales and Services American for DAI also averred generally that Menards' May 2019 letters:  (1) "harmed the reputation of DAI to perform exemplary MRO work in turbine engines"; and (2) "diminished the good will that DAI has established over 60 years with its customer and the aviation community."  (Turner Decl. (dkt. #106) ¶¶ 32-33.)

OPINION

## I.  Cross-Motions for Summary Judgment

DAI asserts two counterclaims against Menards under Wisconsin common law, both of which are based largely on the May 2019 letter:  defamation and tortious

9

interference with current and prospective contractual relationships. The parties have cross-moved for summary judgment on DAI's counterclaims. As noted above, to obtain summary judgment on claims for which it bears the burden of proof, DAI "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). At minimum, given the lack of admissible evidence establishing that it was injured or suffered damages, DAI has not met the high burden to find Menards liable on either counterclaim as a matter of law. As such, while the two motions contain overlapping issues, the court will focus on Menards claimed bases for summary judgment in reviewing the parties' arguments.

Under Wisconsin law, "a defamation claim involves three elements: '(1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and (3) the communication is unprivileged and tends to harm one's reputation.'" *Hussain v. Ascension Sacred Heart -- St. Mary's Hosp., Inc.*, No. 18-CV-529-WMC, 2019 WL 5310677, at *10 (W.D. Wis. Oct. 21, 2019) (quoting *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472 (1997)). As for the third element, "a conditional privilege is an affirmative defense." *Emiabata v. Marten Transp., Ltd.*, 574 F. Supp. 2d 912, 919 (W.D. Wis. 2007) (citing *Otten v. Schutt*, 15 Wis.2d 497, 504, 113 N.W.2d 152, 156 (1962)). As such, "[t]he burden is on defendant, not plaintiff[], to prove the communication was protected by privilege." *Id.* "Only after the defendant affirmatively claims and the court determines, that a conditional privilege exists

10

does the burden of proof shift to the plaintiff to affirmatively prove abuse." *Wesbrook v. Ulrich*, 90 F. Supp. 3d 803, 809–10 (W.D. Wis. 2015) (citing *Zinda v. La. Pac. Corp.*, 149 Wis.2d 913, 926, 440 N.W.2d 548, 554 (1989)).

Similarly, with respect to its tortious interference claim, DAI must prove that: (1) it had a contract or a prospective contractual relationship with a third party; (2) Menards interfered with that relationship; (3) the interference was intentional; and (4) there was a causal connection between Menards' interference and DAI's damages. *See Am. Dairy Queen Corp. v. Universal Inv. Corp.*, No. 16-CV-323-WMC, 2017 WL 3701865, at *6 (W.D. Wis. Aug. 25, 2017) (citing *Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531).   Moreover, "to sustain a claim, the interference must also be both without a recognized justification and privilege, although the alleged interfering party [again] has the burden to prove that its actions were justified or privileged." *Id.* (citing *Briesemeister*, 2006 WI App 140, at ¶ 50).

Here, Menards contends that summary judgment is warranted because (1) the statements in the letter are truthful; and (2) the letter is subject to either the common interest privilege or the judicial immunity privilege.   The court addresses each contention below.

## A. Truth

For its defamation claim, DAI has the burden of proving that the statements are false. *See Hussain*, 2019 WL 5310677, at *10 ("[P]laintiff must advance proof permitting a reasonable jury to find the allegedly defamatory statement was false.").   For the tortious interference claim, "substantial truthfulness" is a defense. *Wesbrook v. Ulrich*, 840 F.3d

388, 395–96 (7th Cir. 2016).  Accordingly, Menards seeks summary judgment on the basis that DAI cannot prove the statements in the May 2019 letter were false or rebut proof that the statements were substantially truthful.

Specifically, in its motion, Menards identifies nine statements in its May 2019 letters and argues that each is true and accurate.  (Menards' Opening Br. (dkt. #100) 6-9.)  In response, DAI argues that Menards' approach is "overly simplistic" and fails to recognize that defamation claims can be based on implied statements under Wisconsin law.  (DAI's Opp'n (dkt. #116) 5-6.)  *See Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 799-800 (W.D. Wis. 2006) (holding that typographical "error implies that [plaintiff] is a sloppy writer and a careless editor who failed to proofread her broadcast letter before mailing it to potential employers," and that "[t]his allegedly false implication is sufficient to support the first element of a claim of defamation") (citing *Mach v. Allison*, 2003 WI App 11, ¶ 12, 259 Wis.2d 686, 656 N.W.2d 766 (2002)); *see also Frinzi v. Hanson*, 30 Wis. 2d 271, 277, 140 N.W.2d 259, 262 (1966) ("One may be libeled by implication and innuendo quite as easily as by direct affirmation.").

As quoted in the fact section of this opinion, the opening paragraphs of the letter directed to all owners of Pratt & Whitney 530A engines essentially represents that Menards' Corporate Counsel Tidey is writing to "inform you of a potential safety risk that we discovered" with those engines.  More specifically, Menards advises that an inspection revealed broker diffuser bolts in three of the four engines in its planes, prompting Menards to file a "Service Difficulty Report with the FAA and the engines were taken out of service."  The second paragraph then ends with the flat assertion that "these engines are not safe to

12

fly in their current condition."  The next paragraph identifies Dallas Airmotive, Inc. as the entity who "performed engine overhaul work on the engines," and states that there was a "<u>two year time gap</u> between overhauls" of the four engines, leading Menards to believe "there may be other engines that are currently operating with broken diffuser bolts." (Emphasis in original.)

DAI contends that this juxtaposition of a safety issue, rendering airplanes with Pratt & Whitney 530A engines not safe to fly, immediately before a paragraph identifying DAI as the entity that performed the service work on at least two different occasions on the engines with the broken diffuser bolts implies that DAI was negligent or otherwise responsible for rendering these planes not safe or that at least a reasonable jury could so find.  This strikes the court as an exceeding close question.  Certainly, the May 2019 letter straightforwardly calls into question the safety of the Pratt & Whitney 530A engines, and in particular, questions defects in its diffuser bolts, stating outright at one point that the engines are "not safe to fly" and, at least implicitly, suggesting that the FAA agrees with that assessment.  On its face, however, the letter is silent as to DAI's contribution, if any, to that assessment.  Indeed, one could read the letter as suggesting that DAI *discovered* -- rather than *caused* -- any defect as part of the overhaul work.  On the other hand, the letter is plainly written to cause a controversy and unearth other evidence of defects (as well as, no doubt, other potential plaintiffs), and *could* be read as suggesting that DAI's removal and insertion of the diffuser bolts (as opposed to replacing them) may have at least contributed to the problem.  The latter may be a stretch, but DAI has some evidence that at least some recipients interpreted the letter that way.  With the limited record before the

court on cross-motions for summary judgment, the court is unable to decide this question as a matter of law, and will leave it to a jury in the first instance.[8]

In its reply, Menards also argues that "there is no possible negative implication contained in the letters," citing as support the Wisconsin Supreme Court's decision in *Frinzi* and a decision of the District Court for the Southern District of New York in *Biro v. Conde Nast*, 883 F. Supp. 2d 441 (S.D.N.Y 2012).  In *Frinzi*, the Wisconsin Supreme Court recognized that a statement can be libelous by implication, but found that the statement at issue in that case -- that the plaintiff was considering running as an independent -- was not libelous because "[r]unning as an independent after being defeated in a party primary is not disgraceful or [an] action which should or does hold a person up to public ridicule or contempt."  *Id.* at 289, 140 N.W.2d at 262.  Here, arguably implying that a company providing a service overhaul of an engine was responsible for (or at least contributed to) a profound safety issue *is* susceptible to a defamatory meaning, or at least, a reasonable jury might find.  In *Biro*, the district court found the phrase "'purported' painting" was not susceptible to a defamatory meaning that the painting was not genuine, or even that the plaintiff was the only person who claimed that it was genuine or authentic.  883 F. Supp. at 470.  However, that decision does not challenge or call into question a jury's right to find the statements at issue here to be implicitly defamatory.  *Id.* at 470.

Menards next argues "[n]egative implications that are true are not defamatory as a matter of law."  (Menards' Reply (dkt. #126) 6.)  Fair enough, but there are fact issues as

---

[8] For example, it is unclear on this record whether Menards took subsequent steps to promote that interpretation.

to whether DAI was negligent in its overhaul work on the engines, and whether that negligence caused Menards' alleged injury.  In other words, the implication of the letter -- that DAI was responsible for the safety issue -- turns on disputed facts that are also central to Menards' negligence claim against DAI.  Critically, that claim is not before the court at summary judgment, and to avoid summary judgment on its counterclaims, DAI need not prove a *lack* of negligence.  Instead, it simply must prove that a reasonable jury could find that the May 29 letter was false (by implication or otherwise).  Here, if the jury finds that DAI was *not* negligent, then the jury could also find that the May 29 letter implying that DAI was negligent in its overhaul work was not substantially true.

Finally, Menards contends that DAI's argument that the letter was implicitly false only saves its defamation claim, because "Wisconsin courts make no exception to this rule for truth statements that allegedly contain negative implications."  (Menards' Reply (dkt. #126) 8.)  This argument is a red herring.  Tortious interference claims do not require a false statement.  While "the transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract," *Liebe v. City Fin. Co.*, 98 Wis. 2d 10, 13, 295 N.W.2d 16, 19 (Ct. App. 1980), nothing about this line of cases undermines a tortious interference claim based on an implicitly false statement, and the court sees no basis in law to limit such a claim to an express statement.

As such, the court finds that genuine issues of material fact exist as to whether the letter contains a false statement -- namely, (1) whether it implies that DAI was negligent in its servicing of the engines at issue and responsible for the safety issue, and (2) whether

15

that implication is false.

## B. Privileges

Alternatively, Menards contends that it is entitled to summary judgment on DAI's counterclaims because the letter was justified or privileged, either because it was subject to (1) the common interest privilege or (2) the judicial immunity privilege.  As described above, Menards bears the burden of proof as to these privileges.  *See Emiabata*, 574 F. Supp. 2d at 919; *Am. Dairy Queen Corp.*, 2017 WL 3701865, at *6.   If it makes that showing, then the burden shifts to DAI to demonstrate that Menards abused these privileges and, therefore, is not entitled to their protections.  *See Wesbrook*, 90 F. Supp. 3d at 809–10.

### 1. Common interest privilege

As for the common interest privilege, a statement may be privileged if it is "made in furtherance of a common property, business, or professional interests."  *Wesbrook*, 90 F. Supp. at 809 (citation omitted).  Menards contends that the privilege applies here because it "sent letters to other PW530A engine owners who share Menards's professional interest in operating safe aircraft as part of their business operations."  (Menards' Opening Br. (dkt. #100) 10.)  In support, Menards directs the court to *Shannon v. Alliance for the Mentally Ill*, 189 Wis. 2d 17, 20, 525 N.W.2d 299, 300 (Ct. App. 1994), in which the Wisconsin Court of Appeals affirmed the trial court's finding that the common interest privilege applied to one of the defendants, a mental health non-profit organization, who published a warning of abuse and neglect associated with the treatment of mentally ill patients at the plaintiffs' residential treatment facilities.  *Id.* at 20-21, 525 N.W.2d at 300.  Another defendant, a Catholic parish, republished that warning.   *Id.*  In affirming the trial court's finding that

16

the privilege applied, the court reasoned that both defendants are "non-profit entities 'with a special interest' in the care of the mentally ill," and, as such, "they do share a common professional interest." *Id.* at 25, 525 N.W.2d at 302.

While the *Sullivan* court concluded that the two defendants shared a professional interest -- the care of individuals with mental illness -- no similar finding would be reasonable here.  Menards has *no* professional relationship with the 191 other owners of planes with the same engines as the two Cessna planes that Menards had previously owned. The court agrees with DAI that to permit the extension of the common interest privilege on the facts here would make defamation "permissible if you communicate the statements to any person in the world owning the same model vehicle as you own."  (DAI's Opp'n (dkt. #116) 8-9.)  Menards points to *no* support for this far-reaching application of the privilege, nor could this court find a case supporting a shared professional interest solely based on common safety concerns as consumers of a product.

The facts surrounding the application of this privilege are not in dispute.  As a matter of law, Menards has failed to make a prima facie showing that the common interest privilege applies to the May 2019 letter to other owners of planes with PW530A engine. As such, the court will grant DAI's motion on this affirmative defense.[9]

---

[9] Based on this ruling, the court need not consider DAI's alternative argument that even if Menards made out a prima facie case for the application of this privilege, Menards abused the privilege by recklessly disregarding the truth of its communication, publishing it for an improper purpose, engaging in excessive publication, and including superfluous information.  (DAI's Opp'n (dkt. #116) 10-11.)  If the court were to reach this issue, DAI has at least raised a genuine issue of material fact as to whether Menards abused its privilege, serving as another basis to deny its motion.

### 2. Judicial immunity privilege

In Wisconsin, for the judicial immunity privilege to apply, the statements "must (1) be 'relevant to the matter being considered' in the judicial proceedings, and (2) be made 'in a procedural context which is recognized as affording absolute privilege.'" *Converters Equip. Corp. v. Condes Corp.*, 80 Wis. 2d 257, 265, 258 N.W.2d 712, 716 (1977) (quoting *Hartman v. Buerger*, 71 Wis. 2d 393, 398, 238 N.W.2d 505, 508 (1976)). "The absolute privilege to defame in the course of judicial or quasi-judicial proceedings is not limited to statements during trial, but may extend to steps taken prior to trial such as conferences and other communications relevant to the proceeding." *Rady v. Lutz*, 150 Wis. 2d 643, 649, 444 N.W.2d 58, 60 (Ct. App. 1989) (citing *Converters Equip.*, 80 Wis. 2d at 266, 258 N.W.2d at 716). As such, "letters sent to persons having collateral interests in the litigation are privileged to the extent that the alleged defamatory statements have some relation to the subject matter of the proposed litigation and are made in furtherance of the litigation." *Id.*

While Menards has a legal basis for relying on this privilege, the facts surrounding its application are in dispute as well. Specifically, Menards contends that "the purpose of the communications at issue was to obtain evidence for underlying litigation" (Menards' Opening Br. (dkt. #100) 12), but DAI has put forth evidence that Menards considered the impact that this letter would have on co-defendant Pratt & Whitney in drafting the letter. This at least permits a reasonable inference that its subsequent settlement with Pratt & Whitney and attempt at settlement with DAI may have factored into the substance of the letter *and* Menards' motivation in sending it. Moreover, there is a factual dispute as to

18

whether these letters are sufficiently related to the underlying litigation to warrant protection.  Finally, as mentioned above, DAI has raised an issue of fact as to whether Menards abused any privilege it may be entitled to and, thus, waived the protection of the judicial immunity privilege.  For these reasons, the court will deny both parties' motions for summary judgment on the application of this privilege.

## II. Motion for Sanctions

In addition to the two motions for summary judgment, DAI also seeks sanctions against Menards in the preferred form of default judgment in DAI's favor on its counterclaims.  Material to DAI's motion for sanctions, on August 22, 2019, DAI moved to compel responses to discovery concerning the May 2019 letter.  (Dkt. #28.)  Magistrate Judge Crocker granted DAI's motion and ordered Menards to respond to Interrogatories 6-12 and 14, and Document Demand No. 1.  (9/10/19 Order (dkt. #45.)  Among other requests, the interrogatories sought:  a list of recipients of the letter; a list of individuals who were involved in preparing or drafting the letters; and a list of individuals who were aware of the letter before they were sent.  (Mariani Decl., Ex. 2 (dkt. #112-2).)  In pertinent part, Document Demand No. 1 required all documents on which Menards relied in responding to those interrogatories.

On September 18, 2019, Menards served responses to the interrogatories, but produced no documents.  (*Id.*, Ex. 5 (dkt. #112-5).)  On September 30, 2019, DAI served a second set of document demands, seeking more data related to the letters, including internal communications about the letters, any prior drafts, and any documents in the possession of Tidey that relate to the letters and were created or received before September

6, 2019.  (*Id.*, Ex. 6 (dkt. #112-6).)  On November 6, 2019, Menards produced responsive documents, but the majority of the production was the 191 letters themselves.  (*Id.*, Exs. 7a, 7b, 7c (dkt. ##112-7, 112-8, 112-9).)  In particular, Menards produced no prior drafts, internal emails about the drafts, or notes from calls to Menards from recipients of the letter.

DAI noticed the depositions of Michael Tidey for February 20, 2020.  On February 18, 2020, just 36 hours before his noticed deposition, however, Menards finally produced several categories of documents that the court had ordered produced on September 10, 2019, including:  draft versions of the letter; emails between Tidey, O'Brien and Ron Ford, Menards' Director of Flight Operations, about the content of the letter and their concern about Pratt & Whitney's reaction, especially since Menards and Pratt & Whitney were already in settlement negotiations; an email from O'Brien regarding him speaking to John Menard about the letters; and 17 pages of call logs Tidey made regarding his conversations with recipients.  (*Id.*, Ex. 11 (dkt. #112-13).)

In the cover letter accompanying these documents, counsel for Menards stated, apparently by way of explanation for the long delay, that:

> In double checking to determine that you have received all of the documents responsive to the Dallas Automotive Third Request for Production of Documents, we have located some additional documents. . . .  I should note that the final set . . . are documents which we likely have provided earlier to you through discovery or Dallas Automotive has provided to us. However, rather than confirm that fact by checking thousands of pages, it was easier to bate stamp them and provide them to you at this point.

(*Id.* at 1.)  During his deposition, Tidey confirmed that he used the call logs to prepare the

interrogatory answers that were served on September 18, 2019.

If a party fails to obey this court's order to provide discovery, it has the authority to "issue further just orders," including "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2). As reflected above, Menards failed to produce the compelled documents -- or at least some of the most material documents -- until five months after Magistrate Judge Crocker granted DAI's motion to compel.

Menards offers various excuses for the delay in its opposition brief, none of which are particularly availing. *First*, Menards' outside counsel represents in its opposition brief -- but provides no declaration by Menards' counsel or an officer attesting to such a representation -- that the failure to produce the documents in a timely fashion was "inadvertent," and the late produced documents were only discovered when Menards was preparing for its February 20, 2020, depositions. This is the kind of excuse the court *might* accept for not responding fully and timely to another party's document request, assuming no prejudice, but Menards' is well past such indulgences. Having forced DAI to the time and expense of bringing a formal motion to compel *and* requiring the court to order production for Menards' to take five, additional months before completing (and apparently even then attempting to assure compliance) is inexcusable. Absent some further explanation as to why these documents were either not brought forward by Menards or were excluded from the document production, the court has no basis for finding the failure to be "inadvertent."

*Second*, Menards argues that its failure to produce these documents was "minor," basing this argument solely on the fact that it only encompassed 26 pages. As noted,

however, these pages included earlier drafts of the letter, Tidey's notes from phone conversations with recipients of the letters, emails received from recipients, as well as internal emails discussing the reasoning behind the selected language. Absent the formal assertion of a viable privilege from production, the court does not agree with Menards' characterization that *any* of these documents were "minor."

*Third*, Menards has the temerity to argue that the documents were not tied to any court order. This argument ignores the record before the court. While DAI supplemented its discovery requests with additional, more specific requests, the motion to compel, which Judge Crocker granted, included producing all documents on which Menards relied in responding to interrogatories. Moreover, Tidey testified at his deposition that he *did* rely on these documents -- at least with respect to the record of communications with recipients of the letters -- in responding to interrogatories in September 2019.

Of course, if the late production were justified or harmless, than the court may exercise its discretion and not sanction the offending party. *See* Rule 37(c)(1) (making an exception if the offending party can establish that its violation of Rule 26(e) was either justified or harmless"). Moreover, this court "may exercise considerable discretion in determining whether an untimely disclosure . . . is harmless, considering at least the following four factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Equal Employment Opportunity Comm'n v. Meffert Oil Co., Inc.*, No. 11-CV-360-WMC, 2012 WL 13042519, at *3 (W.D. Wis. June 27, 2012) (citing *David v.*

*Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).  While Menards' proof as to its good faith is lacking, so, too, is DAI's direct proof of Menards' bad faith or willfulness.  Similarly, the other three factors listed above suggest that the extreme sanction of entering default judgment in DAI's favor on its counterclaim is not supported on this record.

To begin, the court credits DAI's argument that the late disclosure frustrated its ability to prepare for the February 2020 depositions of Menards' officers.  Even though DAI had these materials in advance of the depositions, there is an air of gamesmanship, or even sharp practice, in such a late production.  Moreover, while the production was critical, a counter balance is that the late production was not so voluminous as to render if impossible for DAI to review them in advance of those depositions.  To the contrary, DAI *was* able to question the Menards' officers about these materials during their depositions. The court also notes that the production was made several months in advance of the trial in this matter.  As for the ability of the party to ameliorate any remaining prejudice, the court is willing to consider a renewed motion to compel the deposition of John Menard, in light of these documents indicating that he was aware of the letters before they were sent out, a fact that arguably could have bolstered DAI's original motion to compel.

Finally, in light of its unexplained delay and lack of due diligence, the court will shift DAI's fees in bringing this motion to Menards, *see* Fed. R. Civ. P. 37(2)(C), and warn Menards that any further delay in complying fully with this court orders could result in further, heightened sanctions.

ORDER

IT IS ORDERED that:

23

1) Plaintiff and counter-defendant Menard, Inc.'s motion for summary judgment (dkt. #99) is DENIED.

2) Defendant and counter-claimant Dallas Automotive, Inc.'s motion for summary judgment (dkt. #104) is GRANTED IN PART AND DENIED IN PART.  The motion is granted as to Menards' common interest privilege affirmative defense; in all other respects, the motion is denied.

3) Defendant and counter-claimant's motion for sanctions (dkt. #111) is GRANTED IN PART AND DENIED IN PART as set forth above.  DAI's petition for attorneys' fees in bringing the motion is due on or before August 21, 2020.

Entered this 31st day of July, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge