IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MENARD, INC.,

     Plaintiff & Counter-defendant,

     v.

DALLAS AIRMOTIVE, INC.,

     Defendant & Counter-claimant,

and

TEXTRON AVIATION, INC.,

     Defendant.

OPINION AND ORDER

18-cv-844-wmc

---

This civil case is set for trial commencing September 21, 2020, with plaintiff Menard, Inc., ("Menards") asserting negligence claims against defendants Dallas Airmotive, Inc. ("DAI") and Textron Aviation, Inc., as well as a breach of contract claim against Textron, arising out of their engine overhaul work on two of Menards' airplanes. In turn, defendant DAI asserts counterclaims for tortious interference with contract and defamation based on Menards' sending 119 letters to other businesses or individuals with planes with the same engines as those in this case. The court issues the following opinion and order addressing the parties' respective motions *in limine* and related motions In advance of the final pretrial conference to be held on September 11, 2020.[1]

---

[1] In addition to ruling on the various, pending motions, the court will also accept the parties' stipulation regarding documents produced by Pratt & Whitney. (Dkt. #148.)

OPINION

## I. Menards' Motions *in Limine* and Other Motions

### A. MIL No. 1: exclude evidence of DAI's lost business damages (dkt. #156)

In its counterclaim, DAI seeks to pursue damages for lost business caused by the alleged defamatory letter.  Specifically, at a 30(b)(6) deposition, DAI Regional Engine Manager Mark Campbell testified that he learned from Signature TechnicAir, Inc. ("TechnicAir"), a third-party broker, that a potential customer GRP's "owner thought that it was perhaps not a good idea to do business with Dallas Airmotive since receiving the letter from Menards."  (Campbell 30(b)(6) Dep. (dkt. #152) 33.)  Menards contends, as the court pointed out in its summary judgment decision, that this proposed testimony would constitute double hearsay.  Menards further points out that Campbell testified that this is the only evidence of alleged lost business.  Finally, Menards points to contrary evidence from DAI's own Customer Resource Management ("CRM") database, which states that:  "Signature TechnicAir has won the business for the airframe and engines.  The engines are going to Pratt due to the new chief pilot's decision.  Steve Hippert [from TechnicAir] stated that the Menard's letter did not influence the decision."  (Menard's Br. (dkt. #156) 3-4 (quoting Ex. C (dkt. #156-3) 5).)

In response, DAI implicitly acknowledges that Campbell's testimony is not admissible, but nonetheless argues that it should be able to submit evidence that:  DAI pitched work to GRP in late 2018 and into 2019; DAI sent quotes and estimates to GRP; and after Menards' letter, GRP declined to hire DAI for the overhaul work.  DAI further argues that evidence from the CRM database should also be excluded because while the

2

notes may be considered a business record, the content of the notes -- what a Signature TechnicAir person said -- is hearsay and should be excluded as well.

The court agrees that both specific pieces of evidence -- Campbell's testimony and the CRM notes about TechnicAir's employee's statement -- constitute hearsay and are not admissible for the truth of the matters asserted. This still leaves the question as to whether any other evidence supports DAI's claim that it lost GRP's business as a result of Menards' letter. As for DAI's evidence that it had provided GRP with bids before Menards' letter, but after DAI had no further contact with GRP, nor did GRP accept its bids, a jury would still have to speculate that *the reason* GRP declined DAI's business was because of Menards' letter. Absent some evidence demonstrating that GRP's business was locked in (or that it's decision to decline the bids was wholly unexpected or highly unusual based on past experience), there would appear no basis for a reasonable jury to find a causal connection between the lost business and Menard's letters. Even then, the court is skeptical that a reasonable jury could find causation absent *some* evidence from GRP itself. Accordingly, this motion will be GRANTED, although DAI may provide a further evidentiary proffer at the final pretrial conference that would permit a jury to find causation.

### B. MIL No. 2: exclude evidence of DAI's reputational damages (dkt. #158)

Related to its first MIL, Menards seeks an order excluding DAI's evidence of reputational damages as impermissibly "speculative." In support, Menards points to the testimony of DAI's Vice President of Sales and Service Network Jeff Turner's 30(b)(6) testimony that: (1) any damages to DAI's reputation is an "unknown number"; and (2) he has "done nothing" to provide an estimate. Menards also points to selected data from

3

DAI's Voice of the Customer ("VOC") surveys that shows:  in 2018, before Menards' letter, 52.54% of DAI's customers surveyed reported being "very satisfied" with their experience with DAI; and in July 2019, after Menards' letter, an increase to 61.25%.  Moreover, DAIs bid win rate increased slightly from 63.3% in June 2019 to 64.1% in July 2019.  (Since the letter was dated May 29, 2019, the relevance of this data is unclear.)

In a meandering response, DAI explains that it intends to elicit damages testimony about reputation harm from Michael Tidey, a member of Menards' inhouse legal team and the signee of the letter, and Michael O'Brien, Menards' Chief Legal Officer at the time the letter was issued, but DAI stops short of explaining how this testimony will actually assist a trier of fact in finding reputational harm, much less offer a proper measure of damages caused by the Menards' letter.  Perhaps, DAI intends to elicit testimony that the purpose of the letter was to harm DAI's reputation, but such an admission would seem unlikely, nor, even with intent, would it warrant a finding of actual damages.  Moreover, DAI cites to no caselaw holding that a reasonable jury could find causation, as well as measure damages, based on a perpetrator's intent to cause reputational damage alone.  Finally, DAI's argument that Tidey's and O'Brien's testimony will establish that DAI demanded a retraction and apology, which Menards refused to provide, also fails to establish that their reputation was in fact injured by issuance of the letter or suggest an amount of money that would compensate DAI for that reputational harm.

In addition, while Turner conceded that he "could not put a specific number" on reputational damages, DAI points out that he further testified that this damage was in the "millions of dollars," claiming specific work losses totaling, at a minimum, $1.3 million.

However, the $1.3 million number appears to be derived solely from DAI's claim of lost business with GRP, and for reasons explained above, DAI lacks admissible evidence demonstrating a causal link between that lost contract and the Menards' letter.  DAI also points to evidence in the VOC surveys, showing that in 2019, 52.27% of the time a customer decided against proceeding with DAI for reasons cryptically stated as "other" or "customer preference."  However, DAI fails to explain how this percentage compares to previous years, nor does it otherwise explain how the jury could find reputational harm or measure damages based on this data.

Still, as DAI hints at in its motion, at least in the context of an individual, "there is a presumption" under Wisconsin law "that the defamed person suffered general damages such as injury to reputation."  *Kennedy v. Children's Serv. Soc. of Wis.*, 17 F.3d 980, 984 (7th Cir. 1994) (citing *Williams v. Hicks Printing Co.*, 159 Wis. 90, 101–02, 150 N.W. 183, 188 (1914)); *see also* I Russel M. Ware, *The Law of Damages in Wisconsin* § 11.24 ("Plaintiffs may recover general damages as compensation for injury to feelings or reputation or because of anguish or humiliation -- harms of a type not easily estimable in monetary terms.").[2] However, proof is required for an award of special damages, which covers "harm of a material, economic, or pecuniary nature."  *The Law of Damages in Wisconsin* at § 11.24. While it is hard to conceive how a corporate entity could be compensated for its "feelings," the Seventh Circuit has recognized damages to goodwill or reputation as permissible

---

[2] As support, DAI actually cites to *Brown v. Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119 (7th Cir. 1987), a case in which the court described a defamation *per se* claim under Illinois law.  Here, however, in libel cases applying Wisconsin law (as is asserted here), there is a presumption that a person suffered general damages such as injury to reputation, but for slander cases, the presumption only applies to slander *per se* claims.  *Kennedy*, 17 F.3d at 983-84.

categories of compensatory damages, while also recognizing that "the damages for such injuries are not as easily quantifiable as a business's lost profits or a tort victim's medical bills." *Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 680 (7th Cir. 2019). Therefore, the court will RESERVE on this motion pending a further proffer by DAI as to its claim for a general damages award based on injury to goodwill or reputation at the final pretrial conference.

### C. MIL No. 3:  exclude testimony regarding Pratt & Whitney's overhaul procedure changes (dkt. #160)

Menards seeks to exclude DAI's employees and expert witnesses testifying as to the interpretation and meaning of changes by Pratt & Whitney Canada Corporation ("Pratt & Whitney") to its overhaul procedures. Menards contends that DAI's witnesses lack firsthand knowledge regarding these matters. As context, Menards explains that:  Pratt & Whitney issued a "Special Instruction" on August 9, 2018, providing "additional recommendations to change the diffuser bolts on wing on the PW530A series engines"; and Pratt & Whitney issued a "Manual Revision" on May 4, 2020, for its PW530A engine overhaul manual. (Menards' Br. (dkt. #160) 2.)  During the 30(b)(6) deposition of DAI's Chief Engineer, Ian Cheyne, who has also been designated as an expert, DAI elicited testimony as to Pratt & Whitney's motive for changing its procedure. DAI asked similar questions of its retained expert witness Aaron Jones.

In response, DAI contends that this testimony is relevant to rebutting Menards' claim that DAI was negligent in applying excess torque to the diffuser bolts because the manual revisions do not concern this issue. DAI also argues that this testimony is

admissible because these witnesses will testify "as to general practices in their line of business" and the testimony will be "grounded in observation and an extensive first-hand experience." (DAI's Resp. (dkt. #229) 2.)  *See also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (explaining that personal knowledge may include reasonable inferences "grounded in observation or other first-hand personal experience.  They may not be flights of fancy, speculations, hunches, institutions, or rumors about matters remote from that experience.").

Assuming DAI is able to lay the proper foundation, the court certainly agrees with DAI that Cheyne and Jones may testify about their own understanding as to why a company *like* Pratt & Whitney issues manual revisions, as well as their understanding of the revisions called for here.  Absent direct testimony from a Pratt & Whitney witness or *perhaps* some underlying expertise about that company's motivations, further testimony specific to Pratt & Whitney's motivations is excluded.  Accordingly, this motion is DENIED IN PART AND GRANTED IN PART.

### D. MIL No. 4: limit DAI's Chief Engineer Ian Cheyne's Testimony (dkt. #161)

Menards further contends that DAI Chief Engineer Cheyne's testimony cannot extend into other areas beyond his "self-professed expert subject matter areas" of "(1) aircraft engine; (2) aviation safety; and (3) the appropriate process for overhauling PW530A engines 'generally.'"  Specifically, Menards challenges six areas of testimony: (1) that measuring breakaway torque is not a valid method for assessing the amount of torque a bolted joint was subject to at installation because this touches on "bolted joint design," which Cheyne testified was beyond his expertise; (2) that galvanic corrosion caused by the

differing materials between the diffuser bolts and the diffuser bolts and diffuser may have contributed to the bolts failing, because that is a "metallurgical opinion," which Cheyne testified was beyond his expertise; (3) that the failure of the diffuser bolts was not caused by overtorqueing, because that is a "failure analysis," which Cheyne testified was beyond his expertise; (4) that the diffuser bolts failed due to high-cycle failure, because this, too, is a "failure analysis"; (5) that the MS9696-24 diffuser bolts are mechanically unsuitable to reinstall on the PW530 engines after overhaul, because this is a "bolted joint design"; and (6) that changes to components during hot then cold assembly processes should be taking into account during joint designer and may have impacted the diffuser bolts, because it is a "material sciences issue," which Cheyne also testified was beyond his expertise. (*Id.* 3-4.)

When asked his areas of expertise Cheyne testified as follows:

> So 47 years of experience of gas turbines and many years of experience of failure, if not -- analysis is a strong word, but at least being involved in failures and how they do and do not happen.

(Cheyne Dep. (dkt. #150) 51.) Cheyne further clarified that he did not consider himself an expert in "failure analysis" because he was not a metallurgist, but that he was nonetheless an expert in "failures and how they happen." (*Id.* at 52.) Cheyne also testified that he was an expert in: "installation and torqueing of aviation bolts"; "the appropriate process for performing overhaul work on Pratt & Whitney 530 engines"; and the "appropriate process for re[as]sembling diffusers onto Pratt & Whitney 530 engines after overhaul," while acknowledging that he was not as much of an expert on that subject as another individual. (*Id.* at 53-54.) Finally, Cheyne testified that while he was a "good

8

generalist" of "the design and behavior of bolted joints," expert was too strong a term. (*Id.* at 54-55.)

In bringing this motion, Menards unreasonably parses Cheyne's deposition testimony, and further attempts to force various opinions into categories for which Cheyne disavowed expertise. In the court's review, *all* six of the challenged opinions fall within one of his claimed areas of expertise. Cheyne's testimony falls within his expertise about engine failures, the installation and torqueing of aviation bolts, and how to perform an overhaul on Pratt & Whitney's engines. Of course, Menards is free to cross-examine Cheyne as to the scope or depth of his lay experience and extent of actual expertise, but the court sees no basis to limit his opinions as to the specific categories challenged. Accordingly, this motion is DENIED.

### E. MIL No. 5: limit DAI's expert Aaron Jones's testimony (dkt. #162)

As noted, in addition to its employee Cheyne, DAI also retained and named Aaron Jones, a metallurgist, as an expert in this case. Menards now seeks to limit Jones's testimony because he "has attempted to offer numerous expert opinions regarding aviation maintenance procedure, aircraft mechanics, and aviation failure analysis," subjects for which he has admitted a lack of expertise. (Menards' Br. (dkt. #162) 1.) Specifically, as to Jones, Menards identifies three opinions that it claims exceed Jones's expertise: (1) that breakaway torque is not a valid method for determining whether an aircraft engine diffuser bolt has been over torqued, because this is an "aircraft failure analysis issues," which Jones admitted goes beyond his expertise; (2) that over-torqueing engine diffuser bolts will not cause them to undergo fatigue, because this is an "aviation maintenance procedure" and

"aircraft failure analysis issue," which Jones admitted goes beyond his expertise; and (3) that it does not matter if any aircraft mechanic follows Pratt & Whitney's overhaul manual instructions with respect to the specified torque for diffuser bolts as long as the mechanic does not torque the bolts to the point of developing a crack, because this is an "aviation maintenance procedure" and "aircraft failure analysis." (Menards' Br. (dkt. #162) 3-4.)

At his deposition, Jones testified that he *was* an expert in failure analysis. (Jones Dep. (dkt. #149) 29.) He further testified that while he was not an "aviation expert," he was "more than comfortable consulting on engineering issues on aircraft that fall within my area of expertise." (*Id.*) Jones also testified that while he "didn't consider [him]self to be an aircraft mechanic expert," he did have expertise in "mechanics in terms of general procedures related to maintenance of aircraft or any other piece of equipment." (*Id.* at 29-30.) When asked whether he was an expert in "airplane failure and safety," Jones responded, "I don't consider myself to be an expert in aviation safety per se, but I would consider myself to be an expert in failure analysis of aviation components as it relates to my background, education, and experience." (*Id.*) Finally, Jones claimed expertise "in the installation and torqueing of aviation bolts" and some areas of "aircraft maintenance." (*Id.* at 30-31.)

As it did with Cheyne's deposition testimony, Menards attempts to parse and narrow Jones' testimony as to the extent of his expertise and then force certain of his opinions into categories that he supposedly disavowed expertise or other self-limited his testimony. This attempt fails. The three challenged opinions fall well within Jones' expertise as to failure analysis generally and the installation and torqueing of aviation bolts

10

in particular.  Having said that, Menards is again free to cross-examine Jones about his experience in the aviation industry specifically.  Either way, this motion is also DENIED.

### F.  MIL No. 6: exclude evidence of $565,000 aircraft sale proposal to Menards (dkt. #163)

In this motion, Menards seeks to exclude evidence of an earlier offer for the two planes in May 2019 of $565,000, which it did not accept.  As context, Menards accepted an offer two months later of $365,000 -- $200,000 less than the earlier offer.  Menards contends that it is only obligated to make "reasonable efforts" to mitigate its damages, and the first offer was not reasonable because (1) Menards was only given four days to accept the offer and (2) the offer would not accommodate giving defendants an opportunity to inspect the planes as part of its discovery obligations in this case.  Unlike the first offer, Menards explains that the second offer was conditioned on the ability of the parties to inspect the planes.  Menards contends that the court should exclude the evidence of the first offer under Rule 403, because the evidence is outweighed by undue prejudice to Menards and jury confusion.

In response, DAI contends that this argument might have traction if Menards had been generally concerned about providing DAI an opportunity to inspect the planes. Instead, DAI argues that Menards accepted the second, lower offer without allowing DAI to inspect the engines first, and that it also allowed individuals to access the hanger housing the planes before DAI was finally allowed to inspect the planes in December 2019, more than five months after their sale.  (DAI's Opp'n (dkt. #235) 2.)

Ordinarily, the court would agree with DAI that the first offer is relevant to the

11

jury's assessment of damages.   Still, the question of whether litigation requirements relieved Menards of having to mitigate its damages by accepting the first, higher offer may be outside of the scope of a jury's purview, at least to the extent it risks creating confusion as to Menards' arguable obligation to offer inspection before sale or take other steps at preserving evidence.   Accordingly, the court will RESERVE on this motion pending a proffer from Menards as to evidence regarding the first offer and efforts to notify defendants before turning it down, as well as further arguments by the parties at the final pretrial conference.

### G.  MIL No. 7:  exclude evidence of settlement discussions with Pratt & Whitney (dkt. #164)

On January 30, 2020, Menards settled its claims against co-defendant Pratt & Whitney.   Menards contends that this evidence is inadmissible under Federal Rules of Evidence 408 and 403.

In response, DAI explains that the settlement does not require Pratt & Whitney to pay any compensation to Menards.   Instead, the only compensation for the release of Pratt & Whitney is that it agrees "to cooperate in discovery only with Menard and PWC will send a witness to the trial of this case only at the request of Menard."  (DAI's Opp'n (dkt. #237) 3 (citing Mariani, Decl., Ex. 25 (dkt. #109-25).)[3]  DAI anticipates that the Pratt & Whitney witness will testify to his belief that Pratt & Whitney did nothing to cause the

---

[3] In the court's review of the relevant paragraph of the settlement agreement, the agreement does *not* preclude Pratt & Whitney from responding to discovery requests by other parties or appearing as a witness for another party, although the court is troubled by the ethics to the extent a lack of Pratt & Whitney's cooperation in discovery is implicit in its agreement with Menards.

diffuser bolts to break in the engines.

Federal Rule of Evidence 408 generally excludes settlement agreements or settlements discussions for the purpose of proving or disproving "the validity or amount of a disputed claim," although there is an important exception:  "The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  Fed. R. Evid. 408(b); *see also Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005) ("Evidence coming out of settlement negotiations is obviously admissible to show bias or prejudice of a witness.").

Here, DAI seeks to admit the settlement terms to show the witness's bias, and specifically its terms requiring Pratt & Whitney to cooperate in discovery "only" with Menards and send a witness to trial "only" at the request of Menards.  As such, should Menards call a Pratt & Whitney representative, then the fact of testimony about a settlement and the specific terms binding its cooperation would be admissible for purposes of cross-examination, although the court would be willing to consider providing a limiting instruction to the jury, informing them that they should not consider those facts for the purpose of proving or disproving DAI's liability.  As for Menards' Rule 403 challenge, the court agrees that the probative value of any information beyond the fact of a settlement and Pratt & Whitney's discovery and witness terms may be outweighed by undue prejudice to Menards.  Accordingly, this motion is DENIED IN PART AND GRANTED IN PART.

### H. MIL No. 8: exclude evidence of Menards' settlement discussions with DAI (dkt. #165)

Menards also seeks to exclude any evidence of Menards and DAI's prior engagement in settlement discussions, beginning pre-litigation in August 2018 and continuing until approximately November 2018, at which time they "fizzled out." (Menards' Br. (dkt. #165) 2.) Menards anticipates that DAI will argue that these discussions are relevant in showing Menards' motivation for sending the May 29, 2019, letter to other owners of PW530A engines, the subject of DAI's defamation counterclaim. Relying on language from the court's motion for summary judgment opinion, Menards argues that the fact of settlement discussions is "only marginally, if at all, relevant to DAI's counterclaims." (*Id.* at 3 (citing 7/31/20 Op. & Order (dkt. #141) 8 n.7.)

Consistent with Menards' assumption, DAI argues that "[t]he settlement negotiation communications between the parties are integral to establish the intent of Menard[s] in sending out the Menard[s] letter," and as such, fall within the 408(b) exception discussed above. (DAI's Opp'n (dkt. #239) 2.) DAI further explains that "[a]fter Menard[s] became aware that DAI would not agree to settle the claims that Menard asserted in the lawsuit, Menard sent letters." (*Id.* at 3.)

Menards' intent is relevant to whether Menards abused the litigation privilege in sending out the letters. The court concluded at summary judgment that there were material issues of fact as to whether the litigation privilege applied in the first place and, therefore, the court did not need to reach the question of whether Menards had abused that privilege. While evidence of Menards' reasons for sending out the letter is material to DAI's claim or, more specifically, rebutting Menards' privilege defense, the gap in time

14

between the breakdown of the settlement conversations in November 2018 and the sending of the letter in May 2019 limits its probative value.   Moreover, the court is concerned about the jury's ability to limit the fact that the parties engaged in settlement discussions to the specific issues of whether the breakdown of those discussions was a reason for Menards' decision to send out the May 2019 letters.   Even so, the court will DENY the motion, but only to the extent of the *fact* of discussions about resolving the parties' dispute, and their approximate timing, rather than *any* of its substance, including its possible terms.

## I.   MIL No. 9: exclude undisclosed expert witness and associated hearsay reports (dkt. #166)

Menards seeks to exclude the testimony of Ming Zhou and her investigative reports on the basis that she was not disclosed as an expert and her reports constitute hearsay.   As context, after the broken diffuser bolts were discovered, DAI hired an outside laboratory to conduct a failure analysis.   Zhou led that investigation and provided two reports to DAI on June 7, 2018.   Despite DAI not naming Zhou as an expert, DAI noticed her deposition on July 21, 2020, and deposed her on July 30, 2020, during which she provided testimony consistent with her reports.

In response, DAI clarifies that it does not intend to call Zhou as a witness, but that it listed her deposition testimony and her reports because DAI's experts relied on her work as part of their investigation and may disclose some portions of her work under Federal Rule of Evidence 703 as part of the basis for their opinions.   Rule 703 in turn provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If

15

> experts in the particular field would reasonably rely on those
> kinds of facts or data in forming an opinion on the subject,
> they need not be admissible for the opinion to be admitted.
> But if the facts or data would otherwise be inadmissible, the
> proponent of the opinion may disclose them to the jury only if
> their probative value in helping the jury evaluate the opinion
> substantially outweighs their prejudicial effect.

Although the experts' use of Zhou's testimony and reports in this manner appears reasonable on its face assuming their reliance was disclosed, Menards did not anticipate this argument.  The court will hear arguments from the parties before ruling on this portion of the motion at the final pretrial conference.  As such, this motion is GRANTED AS UNOPPOSED with respect to excluding Zhou from appearing as a witness (via deposition or live) and the admission of her reports, but RESERVED as to whether DAI's experts may discuss Zhou's testimony and reports as part of their testimony.

## J.  MIL No. 10: exclude DAI's late-produced personnel and training records (dkt. #167)

Menards seeks to exclude employee personnel and training records that were not produced until after DAI's 30(b)(6) deposition on employee training.  DAI purports to oppose this motion, providing additional information about the content of the late disclosure and further represents that the delay in the disclosure was unintentional, but ultimately none of this matters because DAI states unequivocally, "[t]here is nothing of importance to the case in the documents."  (DAI's Opp'n (dkt. #245) 3.)  As such, the motions is GRANTED AS UNOPPOSED.

## K.  MIL No. 11: exclude evidence of claimed spoliation (dkt. #168)

Related to the above motion concerning the admissibility of the earlier $565,000

16

offer on the two planes, Menards also seeks to exclude DAI from introducing any evidence or arguing that Menards engaged in spoliation by selling its two aircraft at issue in this case before the parties inspected the engines. Menards contends that this argument is not appropriate, because the contract for those two planes "prohibited the buyer from accessing or modifying the aircraft engines before the parties' inspection, which took place December 3-5, 2019." (Menards' Br. (dkt. #168) 1.) Therefore, Menards contends that DAI's argument that the sale before the inspection took place constitutes spoliation is unfounded and would be unfairly prejudicial to Menards.

In response, DAI provides additional context surrounding the sale. Specifically, DAI points out that it only learned of the sale when it found a bill of sale in the middle of the production of thousands of documents. Upon learning of the sale, Menards refused to make the engines available for inspection or even tell DAI where the engines were located. On August 22, 2019, DAI moved to compel (dkt.#28), and Magistrate Judge Crocker granted that motion without shifting costs to Menards (dkt. #45). During 30(b)(6) deposition of one of Menards' corporate designees, Preston Hillman, disclosed that *during 2019*, the engines were in an accessible hangar with no oversight by Menards.

While this additional information colors the simple account provided by Menards, DAI stops short of explaining how it was prejudiced by the delayed inspection or presenting evidence that the engines were tampered with before its December 2019 inspection. Absent some evidence, it is unclear what the jury would do with a spoliation instruction, and DAI has failed to explain its relevance here. The appropriate response to Menards' actions was to seek its fees for having to move to compel, which it did but Judge Crocker

17

denied, or possibly seek some additional sanction, but the court sees no basis for that sanction to include an adverse spoliation instruction at trial.  Accordingly, this motion is GRANTED.

**L.  MIL No. 12: exclude testimony from DAI's mechanics who performed the overhaul in 2011 and 2013 (dkt. #187)**

Menards seeks to exclude the testimony of one of the mechanics who performed the overhaul work on the engines at issue in this case on the basis that DAI's designated corporate representative on the topic of overhauls testified that he "did not speak with or otherwise seek information from any of the mechanics who performed the work" before testifying.  (Menards' Br. (dkt. #187) 2.)  At the same time, Menards acknowledges that DAI identified the four subject mechanics in response to discovery, but argues that the court should exclude testimony by the mechanics because DAI failed to prepare its corporate designee adequately on this designated subject.  DAI has now listed one of the mechanics, Felipe Torres, as a witness at trial.

As an initial issue, Menards' representation that DAI Chief Engineer Ian Cheyne testified that he did not speak to any mechanics in advance of his deposition about the engines is inaccurate.  As Menards acknowledges in its brief, during his deposition, Cheyne testified that he "did ask of the mechanics and the quality guys, in general, whether they remembered these specific engines, and their answers were no."  (*Id.* at 4 (quoting Cheyne Dep. (dkt. #150) 120).)  Putting aside this discrepancy, DAI further explains that it does not intend to ask Torres about specific information relating to his work on the 2011 overhaul.  Instead, DAI intends to ask him about "his training, work experience and

knowledge of replacing diffuser bolts generally."  (DAI's Opp'n (dkt. #242) 2.)

In light of the proposed scope of Torres' testimony, which is entirely consistent with Cheyne's deposition testimony that the mechanics did not remember the specific engines at issue here, coupled with the fact that DAI timely disclosed Torres and the other three mechanics who had conducted the overhaul, this motion is DENIED.

## II. DAI's Motions *in Limine*

### A. MIL No. 1: exclude testimony of Menards' expert Steven Meyers (dkt. #176)

DAI seeks to exclude Menards' expert Steven Meyers, an engine consultant with DVI Aviation, because his conclusions that DAI applied excessive torque "is based on flawed and unsupported experiments, the speculation of persons who have never been deposed or even involved in the engine investigation, and slipshod measurements of metallurgical specimens."  (DAI's Br. (dkt. #176) 2.)

The admissibility of expert testimony in federal courts is governed principally by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods
> to the facts of the case.

A district court functions as a "gatekeeper" regarding expert testimony.  The court must determine whether a party's proffered expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (the expert testimony must be "not only relevant, but reliable").  Although expert testimony is "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), it must nevertheless satisfy the following three-part test:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;
>
> (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and
>
> (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue, Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

As described above, DAI posits three bases for striking Meyers' testimony, all concerning its reliability.  *First*, DAI argues that after Menards' original theory of liability -- that DAI deviated from the Pratt & Whitney manuals -- did not pan out, Meyers was asked to opine on a new theory originally proposed by an engine mechanic, Steve Critchfield, who believed that DAI may have applied too much torque when reinstalling

20

the diffuser bolts.  This argument is simply an avenue for DAI to cast doubt generally on Menards' theory of liability and does not form a basis for striking Meyers' testimony.  If Meyers simply relied on Critchfield's hunch alone, then the court's ruling would be different, but instead Meyers' conducted his own analysis, which is the subject of DAI's other two challenges.

*Second*, DAI contends that Meyers' conclusion is unreliable because he used a "breakaway torque" method in an attempt to quantify the torque DAI applied in installing the bolts during the overhauls.  DAI contends that this method "has been universally rejected for determining torque after the bolt has been in use and subjected to extreme heat, vibration and other factors that change the preload on the bolt," citing its own expert's report, among other sources, in support.  (DAI's Br. (dkt. #176) 7.)  In particular, DAI points to a seminal work on bolted joints, John Bickford's *An Introduction to the Design and Behaviors or Bolted Joints*, which states:

> The test is only 'fair' on recently tightened fasteners.  Bolts which had been tightened a long time ago can take a lot more torque to loosen -- or to restart -- than was originally applied to them, especially if they have been exposed to heat and/or corrosive fluids . . . . [W]e can never return to previously tightened bolt and measure residual preload, accurately with torque or turn tools.

(*Id.* at 13 (citing Mot., Ex. K (dkt. #176-11) 6).)

Furthermore, DAI contends that the results of the breakaway test used by Meyers actually "confirmed that DAI had *not* applied excess torque, because the exemplars consistently broke in a location *different* than the Menards bolts," and that Meyers "hid" this result.  (DAI's Br. (dkt. #176) 13.)  In further support of this argument, DAI points

to its expert's report, criticizing Meyers for using exemplar bolts "that were never subjected to the same operating stress in a PW530A engine for thousands of operating hours." (*Id.* at 14 (citing Jones Rept. (dkt. #109) 32.))

In response, Menards directs the court to other aviation industry materials that endorse using the breakaway torque method "to determine the magnitude of installation torque after a given span of time, after cyclic thermal or vibration loading, etc." (Menards' Opp'n (dkt. #219) 4 (quoting Ex. D (dkt. #219-4) (NASA Rept. MSFC-STD-468B); *see also id.* at 4-5 (citing Exs. E, F, G (dkt. ##219-5, 219-6, 219-7) (various NTSB reports).) Menards also points to DAI's own use of breakaway torque in investigating the broken diffuser bolts. (*Id.* at 4 (citing Ex. H (dkt. #219-8) (email from DAI's Power Plant Engineer John Failor describing his intention to measure breakaway torque).)

In light of the fact that there appears some support for the use of the breakaway torque method in the industry literature, the court concludes that Meyers' reliance on that test does not render his opinion so unreliable as to warrant striking it. Instead, as Menards argues, this is a classic example of a "battle of the experts," which requires a jury "to determine what weight and credibility to give the testimony of each expert." *Gicla v. United States*, 572 F3d 407, 414 (7th Cir. 2009). DAI is free to cross-examine Meyers about his reliance on this test, as well as the ultimate results, but the court will not strike his testimony as unreliable.

*Third*, DAI challenges Meyers' testimony based on his test showing that bolts were supposedly stretched by the application of excess torque. DAI contends that Meyers "does not know the length of the bolts before installation, only after he removed them"; therefore,

22

he "cannot reach the difference between two values if lacking one of the two values."
(DAI's Br. (dkt. #176) 14.)

In response, Menards contends, as even DAI's expert conceded during his
deposition, that "aviation bolts are manufactured with strict quality control measures, and
adhere to a military standard specification (which provides a narrow range as to what the
original bolt length could have been)." (Menards' Opp'n (dkt. #219) 10.) Here, too, the
court agrees with Menards that this challenge is best addressed through cross-examination
and does not serve as a basis to strike Meyers' testimony.

As such, this motion is DENIED.

### B.  MIL No. 2: exclude testimony of Dr. Richard P. Baron (dkt. #177)

DAI also seeks to strike the testimony of Menards' metallurgical expert, Dr. Richard
P. Baron.  Since this motion depends on the court granting DAI's motion to strike Meyers'
testimony, it is easily disposed.  As DAI explains in this motion, Dr. Barron relied on
Meyers' test results, rather than conducting his own.  Therefore, DAI argues that because
Meyers' testing is unreliable, the court should also strike Barron's testimony.  Because the
court denied DAI's request to strike Meyers' testimony, this motion is also DENIED.

### C.  MIL No. 3: exclude Michael Tidey as trial counsel for Menards (dkt. #178)

Next, DAI seeks an order excluding Menards' corporate counsel Michael Tidey from
acting as trial counsel in this case, on the basis that Tidey's role as both trial counsel and
witness would prejudice DAI and violate the Wisconsin Rules of Professional Conduct.  In
support, DAI points to Tidey's designation as the 30(b)(6) corporate representative on 11

of 21 topics listed in DAI's notice of deposition and his role in drafting and signing the letter that is the subject of DAI's defamation claim.

In response, Menards explains that while Tidey is one of several attorneys listed as counsel of record in this case, he will not serve as "trial counsel," in the sense that he will not be presenting any arguments, questioning witnesses or otherwise acting as an advocate at trial. As such, this motion is GRANTED AS UNOPPOSED.[4]

## D. MIL No. 4: find that FAA regulations preempt state law (dkt. #179)

DAI seeks an order finding that the Federal Aviation Administration's regulations, known as the Federal Aviation Regulations ("FAR") preempt any obligation under state law. DAI argues that both field preemption and conflict preemption apply here. With respect to field preemption, DAI contends that in *City of Burbank v. Lockheed Air Termination*, 411 U.S. 624, 638-39 (1973), the United States Supreme Court recognized the preemptive effect of the Federal Aviation Act of 1958 (the "Aviation Act"), and in turn, that the Aviation Act grants the FAA the sole authority to regulate all aspects of aviation safety. (DAI's Br. (dkt. #179) 6.) *See also Bieneman v. City of Chi.*, 864 F.2d 463, 471 (7th Cir. 1988) ("[F]ederal law preempts the regulation of safety in air travel[.]").

As Menards points out in its response, the cases cited by DAI do not stand for the proposition that federal law preempts state law with respect to the entire field of "aviation safety." Specifically, in *City of Burbank*, the Supreme Court held that the Aviation Act

---

[4] To the extent DAI seeks to exclude Tidey as Menards' corporate representative at trial, that motion is also denied. DAI points to no basis for striking him from serving in this capacity at trial. Not only is there no ethical restriction to his doing so, the court cannot conceive of any arguable prejudice to DAI.

preempted any state law on aircraft noise, in that case, a municipal noise ordinance. 411 U.S. at 638-39. In so holding, the Court expressly held that "[o]ur prior cases on pre-emption are not precise guidelines in the present controversy, for each case turns on the peculiarities and special features of the federal regulatory scheme in question." *Id.* at 638. Similarly, in *Bieneman*, 864 F.2d 463, the Seventh Circuit recognized that while "federal law exclusively determines the content of substantive rules," state court remedies were still available, and in that context, "[t]he state may employ damages remedies . . . to regulate aspects of airport operation over which the state has discretionary authority." *Id.* at 471-72.

Still, DAI persists, arguing that "[i]n Wisconsin, the Federal Aviation Act preempts state common law negligence claims in aviation cases." (DAI's Br. (dkt. #179) 6.) However, the cases DAI cites fall short of supporting such a broad statement. In *Miezin v Midwest Express Airlines, Inc.*, 2005 WI App 120, 284 Wis. 2d 428, 701 N.W.2d 626, the court held that the FARs preempted a claim for failure to warn airplane passengers about the risk of deep vein thrombosis, and even that holding, however, was limited: "On the narrow topic before us -- warnings that are given to airline passengers -- we conclude that the Federal Aviation Act impliedly preempts the application of state common-law negligence standards to failure-to-warn claims like that presented here." *Id.* ¶ 18. Similarly, in *Krueger v. Mitchell*, 112 Wis. 2d 88, 332 N.W.2d 733 (Wis. 1983), the court's holding was limited to a nuisance action against an airport, and the court recognized that "Congress did not intend to entirely preempt the field of aviation." 112 Wis. 2d at 92, 98. In this case, DAI falls well short of demonstrating that the Aviation Act or the FARs completely

preempts Wisconsin contract or negligence law.

In the alternative, DAI also argues that the court should find "[a]ny and all state laws that either directly or implicitly conflict with the FARs as it concerns engine maintenance standards are preempted."  (DAI's Br. (dkt. #179) 7.)  Frustratingly, DAI then stops short of identifying *any* such conflicts.  Perhaps, as DAI argues in its next motion, there is a possible conflict between the FARs and state law regarding any continuing duty, but as described below Menards disavows any claim based on that duty.  For these reasons, DAI's motion is DENIED, albeit without prejudice to DAI relying on the FARs to establish the specific standard of care it owed Menards in overhauling the engines at issues.

### E.  MIL No. 5: exclude DAI processes post-overhaul of the Menards' engines (dkt. #180)

DAI next seeks to exclude any processes or procedures DAI implemented after the 2011 and 2013 overhauls at issue in this case on the basis that they "cannot possibly tend to show whether DAI was negligent when it performed the overhauls in 2011 and 2013 according to the mandated manuals [then] published by Pratt & Whitney."  (DAI's Br. (dkt. #180) 2.)  Specifically, DAI seeks to exclude any evidence that at some point after 2013, it stopped inspecting diffuser bolts and began replacing them regardless of their conditions.  In support of this argument, DAI points to its obligations under the FAR to follow manuals published by the original equipment manufacturer -- here, Pratt & Whitney.

In response, Menards argues that DAI developed the belief in April 2018 that the

diffuser bolts were not sufficiently robust to be reused, but that despite this belief, it did not change its practice to require them to replace diffuser bolts until May 2020, when Pratt & Whitney issued the above-mentioned change to its manual requiring their replacement. Menards argues that DAI's delayed action calls into question the legitimacy of its belief that a defect in Pratt & Whitney's bolts caused the bolts to break.  It is difficult to make sense of either side's argument since the "subsequent repair" is actually inconsistent with Menards' theory of liability, while DAI is asserting that it could only begin replacing all diffuser bolts after Pratt & Whitney approved doing so in 2020.  Accordingly, the court will RESERVE on this portion of the *in limine* motion, pending further argument at the final pretrial conference.

As a separate matter, DAI seeks to exclude any argument that it had a continuing duty to Menards after the overhauls were complete.  As noted, Menards responded that it does not intend to make this argument and the court will GRANT AS UNOPPOSED this portion of the motion.

Accordingly, this motion is GRANTED AS UNOPPOSED IN PART AND RESERVED IN PART.

## F.  MIL No. 6: exclude damages other than actual damage to Menards' engines (dkt. #182)

In this motion, DAI seeks an order excluding any evidence about the risks associated with operating the engines containing broken bolts.  DAI argues that the defect was discovered during a pre-sale inspection, and not in the course of these planes' operations. DAI further contends:  "The degree of risk would not impact whether DAI performed its

work properly or negligently.  The degree of risk would not impact Menards damages, namely the lesser of decreased Engine value or the cost of repair of the broken Bolts and Engines."  (DAI's Br. (dkt. #182) 4-5.)

In its response, Menards argues that DAI "put the safety risks of the engines directly at issue in this case by claiming that Menards' statement in its May 29, 2019, letters, that Menards was 'writing to inform you of a potential safety risk that we discovered with these engines,' is defamatory and constitutes intentional interference with prospective Dallas Airmotive customers."  (Menards' Opp'n (dkt. #224) 1-2.)  This presumes that DAI's defamation claim hinges on that express statement alone, rather than an implicit message that DAI was negligent and DAI's negligence caused the defect in the engines.  As such, Menards may only introduce this evidence (or make this argument) *if* DAI opens the door by arguing that the letter's statement about the engines posing a safety risk was false.

Menards also argues that this evidence is material to its request for punitive damages.  Specifically, "Menards argues that "[e]vidence of the safety risk of flying an aircraft with broken diffuser bolts and other damaged engine parts establishes that Dallas Airmotive intentionally disregarded Menards's safety rights by failing to provide even minimal training to its mechanics to reinstall and torque diffuser bolts correctly on PW530A aircraft engines, and by not implementing a protocol calculated to ensure that Menards's PW530A engines were overhauled properly according to the manufacturer's specifications--both of which the evidence at trial will show."  (Menards' Opp'n (dkt. #224) 6-7.)  This argument strikes the court as a bit of a stretch, but the court will address the issue below in light of DAI's motion to strike Menards' punitive damages claim

altogether.

As such, the motion is GRANTED AS UNOPPOSED as to the introduction of this evidence and argument with respect to Menards' negligence claim; DENIED *if* DAI opens the door by arguing that the May 2019 letter was false because it claimed the diffuser bolt defect created a safety risk; in all other respects, the motion is GRANTED as to DAI's defamation counterclaim; and RESERVED as to the relevance to Menards' punitive damages claim.

### G. MIL No. 7: exclude reference to public safety and safety of flight (dkt. #183)

Related to the prior motion, DAI seeks an order excluding any evidence or argument as to "public safety" and "safety of flight."  This motion is GRANTED IN PART, DENIED IN PART AND RESERVED IN PART for the same reasons explained above with respect to DAI's motion *in limine* number 6.

### H. MIL No. 8: provide adverse instruction and bar witness testimony that relies on condition of engines (dkt. #193)

In this motion, DAI seeks an order providing an adverse instruction and barring witness testimony that relies on the condition of the engines given Menards' delay in arranging for inspection of the planes.  For the reasons provided above in ruling on the Menards' motion *in limine* number 8, this motion is DENIED.

### I. MIL No. 9: exclude claim for punitive damages (dkt. #261)

Finally, as alluded to above, the court granted DAI leave to file an untimely motion,

which seeks to exclude any claim for punitive damages.  In its motion, DAI argues that: Menards failed to plead a claim for these damages; this is a "simple property damages" case; and there is no basis for finding the necessary intent to warrant an award of punitive damages.

Having now reviewed Menards' response, the court agrees that while there is some uncertainty, the most recent guidance from the Seventh Circuit is that a request for punitive damages need not be plead in a complaint.  *See Soltys v. Costello*, 520 F.3d 737, 742 (7th Cir. 2008)  ("Thus, Rule 54(c) contemplates an award of punitive damages if the party deserves such relief—whether or not a claim for punitive damages appears in the complaint."); *see* 5A Arthur R. Miller *et seq.*, Fed. Practice & Proc. § 1319 (4th ed.)  ("Most courts do not treat punitive damages as special damages under Rule 9(g)[.]") (citing cases).

The court also recognizes that punitive damages are available in certain negligence claims under Wisconsin law.  *See Brown v. Maxey*, 124 Wis. 2d 426, 432, 369 N.W.2d 677, 681 (1985)  ("[T]he mere fact that the cause of action is based upon negligent conduct does not preclude a punitive damage award if the plaintiff proves the necessary aggravating circumstances beyond ordinary negligence."); *see also Strenke v. Hogner*, 2005 WI 25, ¶ 39, 279 Wis. 2d 52, 70–71, 694 N.W.2d 296, 305 (recognizing that with the adoption of Wis. Stat. § 895.85(3), "[t]he legislature intended with the heightened standard that now there would be even fewer negligence cases giving rise to punitive damages").

Even so, Menards' negligence proof appears insufficient to meet the heightened standard for an award of punitive damages.  Specifically, Menards' proffered evidence of insufficient training of DAI mechanics appears to fall well short of the kind of evidence

ordinarily required for a reasonable jury to find "that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.85(3). Nonetheless, given that this trial is bifurcated, the court will wait to make a decision on the availability of punitive damages until after the liability phase of the trial. As such, this motion is RESERVED.

## III.  Other Motions

### A.  Menards' motion to permit Pratt & Whitney witness Christopher Hughes to testify via videoconference (dkt. #174)

Menards intends to call Pratt & Whitney Canada Corporation's employee Christopher Hughes as a witness. Hughes resides in Canada. Because of the COVID-19 pandemic, Canadian citizens traveling to the United States are subject to a 14-day mandatory quarantine upon their return. In addition, Pratt & Whitney has issued its own no-travel order for its employees. Menards maintains that Hughes' testimony is relevant to its negligence claim against DAI because Hughes will respond to DAI's theory that changes in Pratt & Whitney's overhaul instructions show that the bolts were defective.

In response, DAI does not appear to object to Hughes' testifying by video, but instead challenges the scope of Hughes' testimony. In particular, DAI argues that to the extent Hughes is called to testify about two reports that Pratt & Whitney issued regarding the engine bolts, he should be barred from doing so given:  (1) Menards' refusal to stipulate to these reports as Pratt & Whitney business records; (2) Hughes' previous disavowal of

any knowledge of at least one of the two reports; and (3) he did not author either report.[5]

As for Menards' motion to allow Hughes to appear via videoconference, that request is GRANTED AS UNOPPOSED.  Menards' counsel should promptly coordinate with the court's IT department to sort out the technology and logistics for his testimony, which can be easily arranged through the clerk's office.  As for DAI's response, the court will RESERVE on the scope of Hughes' testimony, and specifically whether it can cover the two reports issued by Pratt & Whitney about the engine bolts at issue, which will be taken up during the final pretrial conference.

### B. DAI's motion to strike witnesses David Wheeler and Christopher Hughes from Menards' trial list (dkt. #211)

In this motion, DAI seeks to strike two witnesses from Menards' witness list:  DAI's general counsel, David Wheeler, and Pratt & Whitney's employee, Christopher Hughes.  The court already dealt with DAI's challenge to Hughes.  As for its challenge to Wheeler, DAI argues that his *only* involvement in this case was to write to Menards, seeking a retraction and apology for the May 2019 letter.  DAI contends that this action has no relevance to its defamation claim.  In response, Menards states that it will remove Wheeler from its list.  As such, this portion of the motion is GRANTED AS UNOPPOSED, while the court RESERVES as to DAI's challenge to Hughes.

---

[5] DAI goes on to cast broad aspersions about Menards' conduct in this case and seeks shifting of fees under Rule 37(c), although the court is not going down this path.  As it is, DAI's response fails to respond to the specific request raised in Menards' motion.  DAI also raises a concern about Hughes' bias in light of the settlement agreement between Menards and Pratt & Whitney, but the court already addressed this concern in denying Menards' motion to exclude evidence of its settlement with Pratt & Whitney generally or the terms related to cooperation specifically.

**C. DAI's motion to amend its witness list (dkt. #213)**

Finally, DAI seeks to amend its own witness list.  DAI named Menards' Chief Legal Officer Michael O'Brien as a witness to be called live, but has since learned that he is no longer employed.  As such, DAI now seeks to call him by deposition.  DAI also notes that it was intending to ask O'Brien questions relevant to its punitive damages claim -- for example, Menards' general solvency, revenues and profitability, terrain it did not cover during the deposition.  Instead, DAI seeks to add Menards' treasurer as a witness for this purpose.  Menards does not oppose this motion, although noting that it has offered its controller, Rick Souba, as a replacement, and that DAI agreed to this substitution.  As such, the motion is GRANTED AS UNOPPOSED.

## ORDER

IT IS ORDERED that:

1) The parties' stipulation regarding documents produced by Pratt & Whitney (dkt. #148) is ACCEPTED.

2) Menard, Inc.'s MIL No. 1 to exclude evidence of DAI's lost business damages (dkt. #156) is GRANTED.

3) Menards' MIL No. 2 to exclude evidence of DAI's reputational damages (dkt. #158) is RESERVED.

4) Menards' MIL No. 3 to exclude testimony regarding Pratt & Whitney's overhaul procedure changes (dkt. #160) is DENIED IN PART AND GRANTED IN PART.

5) Menards' MIL No. 5 to limit DAI's expert Aaron Jones's testimony (dkt. #162) is DENIED.

6) Menards' MIL No. 6 to exclude evidence of $565,000 aircraft sale proposal to Menards (dkt. #163) is RESERVED.

7) Menards' MIL No. 7 to exclude evidence of settlement discussions with Pratt

& Whitney (dkt. #164) is DENIED IN PART AND GRANTED IN PART.

8) Menards' MIL No. 8 to exclude evidence of Menards' settlement discussions with DAI (dkt. #165) is DENIED as set forth above.

9) Menards' MIL No. 9 to exclude undisclosed expert witness and associated hearsay reports (dkt. #166) IS GRANTED AS UNOPPOSED IN PART AND RESERVED IN PART.

10) Menards' MIL No. 10 to exclude DAI's late-produced personnel and training records (dkt. #167) is GRANTED AS UNOPPPOSED.

11) Menards' MIL No. 11: exclude evidence of claimed spoliation (dkt. #168) is GRANTED.

12) Menards' MIL No. 12 to exclude testimony from DAI's mechanics who performed the overhaul in 2011 and 2013 (dkt. #187) is DENIED.

13) Dallas Airmotive, Inc.'s MIL No. 1 to exclude testimony of Menards' expert Steven Meyers (dkt. #176) is DENIED.

14) DAI's MIL No. 2 to exclude testimony of Menards' expert Dr. Richard P. Baron (dkt. #177) is DENIED.

15) DAI's MIL No. 3 to exclude Michael Tidey as trial counsel for Menards (dkt. #178) is GRANTED AS UNOPPOSED.

16) DAI's MIL No. 4 to find that FAA regulations preempt state law (dkt. #179) is DENIED.

17) DAI's MIL No. 5 to exclude DAI processes post-overhaul of the Menards' engines (dkt. #180) is GRANTED AS UNOPPOSED IN PART AND RESERVED IN PART.

18) DAI's MIL No. 6 to exclude damages other than actual damage to Menards' engines (dkt. #182) is GRANTED IN PART AND RESERVED IN PART.

19) DAI's MIL No. 7 to exclude reference to public safety and safety of flight (dkt. #183) is GRANTED IN PART, DENIED IN PART AND RESERVED IN PART.

20) DAI's MIL No. 8 to provide adverse instruction and bar witness testimony that relies on condition of engines (dkt. #193) is DENIED.

21) DAI's MIL No. 9 to exclude claim for punitive damages (dkt. #261) is RESERVED.

22)     Menards' motion to permit Pratt & Whitney witness Christopher Hughes to testify via videoconference (dkt. #174) is GRANTED AS UNOPPOSED IN PART AND RESERVED IN PART.

23)     DAI's motion to strike witnesses David Wheeler and Christopher Hughes from Menards' trial list (dkt. #211) is GRANTED AS UNOPPOSED IN PART AND RESERVED IN PART.

24)     DAI's motion to amend its witness list (dkt. #213) is GRANTED AS UNOPPOSED.

Entered this 10th day of September, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

35